**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Chapter 11 |
| ROCKDALE MARCELLUS HOLDINGS, LLC and ROCKDALE MARCELLUS, LLC,[1] | Case No. 21-22080-GLT |
| Debtors. | (Joint Administration Requested) |

**AMENDED DECLARATION OF JOHN C. DIDONATO, CHIEF**
**RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

| | | |
|---|---|---|
| STATE OF PENNSYLVANIA | ) | |
| | ) | ss. |
| COUNTY OF ALLEGHENY | ) | |

I, John C. DiDonato, declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of Rockdale Marcellus Holdings, LLC and Rockdale Marcellus, LLC, the above-captioned debtors and debtors-in-possession (the "Debtors"). I have held this position since January 21, 2021, when the Debtors engaged Huron Consulting Services LLC ("Huron") as restructuring advisor. As CRO, I am responsible for overseeing the operations and financial activities of the Debtors, including but not limited to, monitoring cash flow, business relationships, and financial planning.

2.      I also am the Business Advisory Practice Leader of Huron Consulting Services LLC. I received my bachelor-of-science degree from Pennsylvania State University. I am a Certified Turnaround Professional, and formerly held the certification of Certified Public Accountant and Certified Managerial Accountant.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Rockdale Marcellus Holdings, LLC (7117); Rockdale Marcellus, LLC (8767). The Debtors' address is 4600 J. Barry Ct., Suite 220, Canonsburg, PA 15317.

3.      I have more than 35 years' experience as a turnaround advisor and corporate executive.  I have advised debtors, secured lenders, trade creditors, and equity holders in both out of court and in court proceedings, and I have also held various roles with respect to both company-side and creditor/committee-side engagements.  I have extensive experience in U.S. Bankruptcy Courts and have been involved in numerous chapter 11 cases.  I have relevant experience in the oil and gas industry and on cases similar to those presented in the Debtors' cases, including EdgeMarc Energy, Petroglyph Energy, and Unit Corporation.

4.      As a result of my tenure with the Debtors and my turnaround experience, my review of public and non-public documents, and my discussions with other members of the Debtors' management and Huron teams, I am generally familiar with the Debtors' businesses, financial conditions, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' management, Huron personnel, or retained advisors that report to me in the ordinary course of my responsibilities.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

5.      I am over the age of 18 and authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtors.  I submit this First Day Declaration to assist the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") and other parties in interest to understand the circumstances leading to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications (collectively, the "First Day Motions") filed in these cases contemporaneously

- 2 -

herewith.  I am familiar with the contents of each First Day Motion and I believe that the relief sought therein is necessary to permit an effective transition of the Debtors into chapter 11.  I also believe that the relief requested in the First Day Motions will aid in the implementation of efficient chapter 11 cases that will preserve and maximize the value of the Debtors' estates for the benefit of all parties in interest.

## **INTRODUCTION**

6.     Rockdale Marcellus Holdings, LLC ("RMH") and Rockdale Marcellus, LLC ("Rockdale") comprise an independent exploration and production company with a natural gas-focused asset base.  The Debtors' primary production and development activities are located in the Marcellus Shale development area in northeastern Pennsylvania.  The Debtors' assets are predominately natural gas wells and acreage, with 68 operating wells and approximately 43,000 net acres under lease.

7.     As explained more fully below, the Debtors—like many other participants in the oil and gas sector—have struggled during a sustained period of depressed commodity pricing.  This led to a borrowing-base redetermination by lenders under the Debtors' reserve-based loan (the "RBL") in October 2020.   The collateral redetermination not only reduced future borrowing availability, but it also obligated the Debtors to pay down the principal balance of its RBL facility resulting in an immediate liquidity shortfall.  Further development activities (*e.g.*, drilling new wells) and capital expenditures were suspended as a result of the lack of liquidity.

8.     As also explained more fully below, the Debtors' profitability has been further hampered by a costly agreement governing gathering and transportation of gas from the wellhead to market.  UGI Energy Services ("UGI") owns the system/piping that moves the Debtors' gas to market, and the Debtors' agreement with UGI compels, among other terms, certain minimum volume commitments ("MVC"), capital recovery charges, as well as compression and

gathering fees (with escalation). Certain of the Debtors' financial commitments to UGI remain fixed by contract, even as commodity prices deteriorated. The agreement also has significant "dedication" commitments, which contributed to the business' lack of growth and business combinations/sales to other operators in the area. Taken together, the commercial terms of the UGI agreement negatively impact the sustainability of the Debtors' capital structure and limit their restructuring alternatives.

9.       The Debtors have pursued an out-of-court resolution of the Debtors' debt burden for nearly a year. Those efforts have included a regular way M&A sales process, attempted renegotiation of the UGI gas gathering and transportation agreement by various parties, and discussions with the Debtors' secured creditors (who have been in default forbearance for nearly 9 months). Parties have negotiated in good faith and in a commercial manner. But, despite long and exhaustive efforts, the terms of a consensual out-of-court restructuring have not emerged.

10.       The Debtors filed these cases with a dual-pronged strategy to reorganize their businesses. The first prong is a section 363 sales strategy, which will be conducted by the Debtors' investment banker—Houlihan Lokey Capital, Inc. ("Houlihan Lokey")—pursuant to market-standard and Court-approved sales procedures. As part of this strategy, the Debtors will seek the rejection of the UGI agreement so that bidders will have the opportunity to bid for assets with or without UGI providing gathering/transportation services, at their option.

11.       The second prong is a plan strategy, which the Debtors will pursue (excising its fiduciary out of the section 363 sales process) if a better, more value-maximizing event emerges before the sale hearing. Given that plan feasibility will likely necessitate the injection of substantial capital, the Debtors' proposed rejection of the UGI agreement may help initiate such

an event.  But, as with the section 363 sales process, ultimate rejection of the UGI agreement will be at the option of whichever plan sponsors may appear.

12.     Under either exit strategy, the Debtors plan to emerge from bankruptcy as a reorganized, appropriately capitalized business enterprise.  The bankruptcy filing is the culmination of unsuccessfully acquiring new capital, an extended default forbearance without a direction forward, an unsustainable debt burden, and an onerous midstream agreement that restricted viable restructuring alternatives.  The Debtors believe that their "dual-prong" strategy will maximize value for the estate.

13.     To familiarize the Bankruptcy Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief that the Debtors are seeking in the First Day Motions, I have organized this First Day Declaration as follows:

- **Part I** provides an overview of the Debtors' business;

- **Part II** provides an overview of the Debtors' organizational and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases; and

- **Part IV** summarizes the Debtors' strategy in these chapter 11 cases and the evidentiary basis for the relief requested in each of the first day pleadings.

## I.     <u>OVERVIEW OF DEBTORS' BUSINESS</u>

14.     The Debtors constitute a privately held independent exploration and production company engaged in the acquisition and development of natural gas.  The Debtors maintain offices in Canonsburg, Pennsylvania and Houston, Texas, and production operations in the Pennsylvania counties of Lycoming, Bradford, and Tioga.  The Debtors were formed principally to explore and produce hydrocarbons from the Marcellus Shale formation.  The Debtors' operations are situated as follows:



15.     In October 2017, the Debtors acquired from SWEPI LP the working interests[2] in more than 41,000 net leasehold acres, including 53 horizontal natural gas wells producing approximately 32 mmcf/d in the northeastern Pennsylvania counties of Lycoming, Bradford, and Tioga (the "Texas Creek Assets") for a purchase price of $92.5 million.

16.     The Debtors' strength lies in the high-quality reservoir underlying their leasehold position, as well as their ability to leverage significant innovations in completions technology to generate maximally efficient natural gas production, outperforming larger and better-capitalized competitors within the Appalachian Basin.

---

[2] A holder of a working interest is responsible for its *pro rata* share of capital expenditures and lease operating expenses based on its percentage working interest and is entitled to revenues derived from such interest based on the holder's net revenue interest.  A leaseholder's net revenue interest in a property generally equals such holder's working interest in such property less any royalties, production payments, and any other interests burdening the property.

17.    The Debtors' completions prowess is augmented by a state-of-the-art water gathering infrastructure, which is equal parts cost-savings mechanism and supplemental revenue generator.  Rockdale also charges other area operators for freshwater volumes.

18.    A recent increase in natural gas prices, though arriving too late to rescue the fortunes of the Debtors outside of a chapter 11 process, presents an opportunity for significant future upside return when development capital is made available to fund additional drilling and completions activities.

## II.    OVERVIEW OF DEBTORS' ORGANIZATIONAL AND CAPITAL STRUCTURE

### A.    *Organizational Structure and Governance*

19.    The Debtors are organized as limited liability companies under Title 3 of the Texas Business Organizations Code.

20.    RMH is owned by a group of individual and institutional investors, including members the Debtors' senior management team, who own common units indirectly in Rockdale through an aggregator entity known as Rockdale Holdings, LLC.  Tsunami Marcellus Partners, LP is the single largest equity holder in RMH, owning more than 85% of the Preferred A Units in RMH.  Rockdale is the wholly-owned subsidiary of RMH.  The Debtors' current organizational structure is as follows:



21.    In addition to the organizational structure captured above, on August 2, 2021, Rockdale Marcellus Operating, LLC ("RMO") was formed in Delaware as an wholly-owned subsidiary of RMH.  RMO is not a debtor, has not transacted business, and holds no assets.

22.    The Debtors have no employees and outsource all functions of asset management pursuant to the Employee Leasing Agreement, dated as of March 1, 2019, with Energy Operating Corp. (formerly Tilden Management Services, Inc.).  Other than the Debtors' engagement of Huron and myself, as CRO, all employees and executives necessary for the Debtors' operations are provided by or contracted through Energy Operating Corp ("EOC").

23.    Prior to January 21, 2021, Rockdale was governed entirely by its sole member, RMH, which, in turn, was governed by RMH's board of managers (the "Board").  The Board now consists of six individuals, three of whom are appointed by the holders of the preferred equity in RMH, and three of whom are appointed by the holders of the common equity in RMH.

24.    The Board authorized my appointment as CRO and retained the services of Huron on January 21, 2021.  The Debtors intend to seek the Bankruptcy Court's authorization to

retain Huron to provide my services as CRO and to provide additional staff to support me in my role as CRO and to perform certain financial advisory services.

### B.    *Capital Structure*

25.    The Debtors funded the acquisition and development of the Texas Creek Assets through a combination of approximately $73.0 million in debt and $24.3 million in equity financing at closing (with subsequent equity raised post-closing).

26.    <u>Prepetition RBL Facility</u>.  Pursuant to the credit agreement dated as of June 21, 2018 (the "<u>Prepetition RBL Agreement</u>" and, collectively with the Loan Documents (as defined in the Prepetition RBL Agreement) and any other agreements and documents executed or delivered in connection therewith, the "<u>Prepetition RBL Documents</u>"), among (a) Rockdale, (b) the guarantors party thereto (the "<u>Prepetition RBL Guarantors</u>"), (c) lenders party thereto from time to time (the "<u>Prepetition RBL Lenders</u>"), and (d) Delaware Trust Company, as successor administrative agent to Citizens Bank, N.A. (in such capacity, the "<u>Prepetition RBL Agent</u>" and, collectively with the Prepetition RBL Lenders, the "<u>Prepetition RBL Parties</u>"), the Prepetition RBL Lenders provided revolving credit loans (the "<u>Prepetition RBL Loans</u>") and other financial accommodations to, and issued letters of credit and hedge agreements for the account of, Rockdale pursuant to the Prepetition RBL Documents (the "<u>Prepetition RBL Facility</u>").

27.    The Prepetition RBL Facility is a reserve-based revolving credit facility with an original commitment amount of $115 million and a maximum credit amount of $300 million, subject to the borrowing base.  The Prepetition RBL Facility has a scheduled maturity date of July 18, 2022 and bears non-default interest at 1.25% to 2.25%, plus the greatest of (a) the Prime Rate in effect on such date, (b) the Federal Funds Effective Rate in effect on such day plus 0.50%, and (c) LIBOR plus 1.00%.  As of the Petition Date, the aggregate principal amount of outstanding Prepetition RBL Loans under the Prepetition RBL Facility was not less than

approximately $115.0 million³ (collectively with the Citizens Hedge Early Termination Claim (as defined below) and accrued and unpaid interest and fees on such obligations, the "Prepetition RBL Obligations").

28.     Prepetition Third Party Hedge Claims.

a.     Prior to the Petition Date, Citizens Bank, N.A. ("Citizens"), an original Prepetition RBL Lender and the original administrative agent under the Prepetition RBL Agreement, entered into several hedge agreements with the Debtors pursuant to an ISDA Master Agreement dated as of March 13, 2019 (the "Citizens Hedge").

b.     Shell Trading Risk Management, LLC ("Shell") and J. Aron & Company ("J. Aron" and, collectively with Citizens and Shell, and their respective successors and assigns, the "Designated Third Party Hedge Providers") also each entered into Hedge Agreements with the Debtors (respectively, the "J. Aron Hedge" and "Shell Hedge" and, collectively with the Citizens Hedge, the "Prepetition Third Party Hedge Documents").

c.     Citizens properly terminated the Citizens Hedge on or about May 3, 2021, and, following such termination, Citizens and the Debtors agreed in writing that the aggregate principal amount due to Citizens by the Debtors on account of the early termination of the Citizens Hedge was approximately $3.7 million (the "Citizens Hedge Early Termination Claim").  The Prepetition RBL Lenders subsequently acquired from Citizens the Citizens Hedge Early Termination Claim.

d.     J. Aron properly terminated the J. Aron Hedge on or about May 5, 2021, resulting in a secured claim against the Debtors in the amount of approximately $5.1 million (the

---

³ The $115.0 million figure does not include any pay down from the proceeds released from the DTA Collateral Reserve Account.

"J. Aron Hedge Early Termination Claim" and, together with the Citizens Hedge Early

Termination Claim, the "Prepetition Hedge Obligations").

      e.    As of the Petition Date, Shell had not terminated the Shell Hedge.  By the

Debtors' calculations, if such hedge were terminated today, Shell would have a claim against

Debtors in the amount of approximately $20.9 million.  The Debtors intend to pay the monthly

hedge settlements consistent with the terms of the Shell Hedge.

      f.    The Prepetition Hedge Obligations constitute "Obligations" under the

Prepetition RBL Agreement secured by the Prepetition RBL Liens (defined below).

      29.    Prepetition RBL Liens and Prepetition RBL Collateral.  Prior to the Petition

Date, as security for the Prepetition RBL Obligations, Rockdale and the Prepetition RBL

Guarantors granted to the Prepetition RBL Agent, for the benefit of itself and the Prepetition RBL

Lenders, a first priority security interest in and continuing lien on (the "Prepetition RBL Liens"),

substantially all of their assets and property (collectively, the "Prepetition Collateral").[4]

      30.    Prepetition Second Lien Facility.  Pursuant to the term loan agreement dated

as of July 18, 2018 (the "Prepetition Second Lien Loan Agreement" and, collectively with any

other agreements and documents executed or delivered in connection therewith, the "Prepetition

Second Lien Documents"), among (a) Rockdale, as borrower and other credit parties thereto,

(b) White Oak Global Advisors, LLC, as administrative agent (the "Prepetition Second Lien

Agent"), (c) the guarantors, and (d) the lenders party thereto (the "Prepetition Second Lien

Lenders" and, together with the Prepetition Second Lien Agent, the "Prepetition Second Lien

---

[4] See Prepetition RBL Documents.

Parties"), the Prepetition Second Lien Lenders provided a term loan (the "Prepetition Second Lien Loans") to Rockdale pursuant to the Prepetition Second Lien Documents.

31.    Prepetition Second Lien Obligations.  The Prepetition Second Lien Loan Agreement provided Rockdale with the Prepetition Second Lien Loans.  As of the August 31, 2021, the aggregate principal, accrued interest, and other charges outstanding under the Prepetition Second Lien Loan Agreement was approximately $50.5 million.  The Prepetition Second Lien Loan Agreement matures on January 19, 2023, and, as amended, bears non-default interest at 10.00% plus the greater of (a) 1.00% per annum and (b) LIBOR, in either case *plus* 10.00%.

32.    Prepetition Second Priority Liens.  Prior to the Petition Date, Rockdale and the Prepetition Second Lien Guarantors granted to the Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Parties, subject to the Intercreditor Agreement (as defined below), a second priority security interest in and continuing lien on (the "Prepetition Second Priority Liens") the Prepetition Collateral.[5]

33.    Intercreditor Agreement.  The Prepetition RBL Agent and the Prepetition Second Lien Agent entered into an Intercreditor Agreement dated as of July 18, 2018 (the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition RBL Parties and the Prepetition Second Lien Parties with respect to the assets and properties of the Debtors and other obligors.  Pursuant to the Intercreditor Agreement, the Prepetition RBL Liens are senior and prior in right to any Prepetition Second Priority Lien in respect of the Prepetition Collateral.

34.    Third Party Intercreditor Agreement.  Pursuant to an Intercreditor Agreement dated as of July 6, 2018 (the "Third Party Intercreditor Agreement"), among Citizens,

---

[5]  See Prepetition Second Lien Documents.

in its capacity as the original Prepetition RBL Agent, each of the Designated Third-Party Hedge Providers, and the Debtors, the Prepetition Hedge Obligations are secured by liens on the Prepetition RBL Collateral, and such liens are of equal priority to and *pari passu* with the Prepetition RBL Liens.

<u>Summary of Capital Structure</u>.  The following summarizes the capital structure of RMH through September 21, 2021, inclusive of unpaid interest and fees.

**Rockdale Marcellus Holdings, LLC**
*Capital Structure*
*in $000's*

| Balance as of 9.21.2021 | | | |
|---|---|---:|---|
| [1] | 1st Lien Credit Facility | 115,001 | Alta |
| [2] | Hedge Termination Claims | 8,908 | Alta and J Aron as hedge counterparties |
| | **Senior Secured Debt** | **123,909** | |
| [3] | 2nd Lien Credit Facility | 50,507 | White Oak |
| | **Total Secured Debt** | **174,416** | |
| | | | |
| [4] | Preferred A Units | 28,593 | |
| [4] | Preferred B Units | 500 | |
| | **Total Preferred Units** | **29,093** | |
| | | | |
| [4] | **Total Common Units** | **69** | |
| | **Total Equity Contribution** | **29,162** | |
| | | | |
| | **Total Secured Debt + Equity** | **203,578** | |

*Notes*
[1] Principal balance includes forbearance fees and PIK interest but does not include pay down from collateral reserve account
[2] Alta purchased the terminated Citizens hedge. Shell has an open hedge position for approx. negative $20.9M MTM
[3] Principal balance includes forbearance fees and PIK interest as of 8/31/21
[4] Amounts reflect initial  capital contribution

## III.    IMPACT OF MARKET ON DEBTORS' BUSINESS AND EVENTS LEADING TO BANKRUPTCY

### A.    *Market Pressures*

35.    In addition to the company-specific difficulties detailed herein, the Debtors have suffered from the natural gas industry's general and sustained decline that occurred over the past several years and were exacerbated by the demand shock as a result of the COVID-19

pandemic.  As a result of all of these factors, the Debtors have not had sufficient capital to drill a well since April 2020.

36.    At its essence, the distress in the industry is a function of commodity prices and the decades-long disruption caused by the advent of widespread hydraulic fracturing and horizontal drilling.  While commodity price volatility and declines affecting crude oil prices have garnered more significant media coverage, the previous decline in natural gas prices had been even starker, if less widely publicized.  For example, as the following chart shows, over the 18-month period ending June 2021, natural gas prices remained consistently low and unpredictable.



37.    As illustrated above, natural gas prices declined significantly in early 2020 as the impacts of the onset of the COVID-19 pandemic curtailed natural gas consumption, particularly in the commercial and industrial sectors.  In late June and early July 2020, at a time that the Debtors achieved high-water daily production volumes, the Henry Hub natural gas price hovered between $1.50 and $1.80 per MMBtu.  This price environment contributed considerably to the Prepetition RBL Agent's decisions to freeze and ultimately reduce the Borrowing Base (as defined below) under the Prepetition RBL Agreement.

38.    While natural gas prices have recovered over the last few months, the increased price per MMBtu is insufficient to reverse the Debtors' financial position.  The price increase is the proverbial "too little, too late."  As detailed below, the Prepetition RBL Agent's

decision to reduce the Debtors' Borrowing Base and require the Debtors to make material cash repayments to the Prepetition RBL Parties was the tipping point from which the Debtors could not recover, even as natural gas prices increased.  The upward trend of natural gas prices has not been sufficient to increase the Debtors' liquidity to cure its monetary defaults and fund operational growth, which would allow the Debtors to reap greater benefits from the recent price increases.

39.    Moreover—and more importantly—there can be no assurances that very recent price improvements will continue long into the future, especially given pandemic-related economic uncertainty.  Should pricing revert back to the five-year average, and should the UGI contract remain in place, the Debtors' business profile will remain unsustainable.

**B.    *Negotiations with Prepetition RBL Parties***

40.    As is standard in reserve-based loans, the Prepetition RBL Documents provided for the borrowing base (the "Borrowing Base") from which the Debtors could draw.  The Borrowing Base is re-determined at set intervals based upon upward or downward changes in the value of the underlying hydrocarbon reserves.  The Prepetition RBL Documents further included minimum liquidity covenants and restricted the Debtors' access to commodity hedging arrangements, which is a common practice for managing a natural gas producer's exposure to risk associated with commodity price volatility.

41.    As of October 2020, the Debtors had borrowed $113.92 million under the Prepetition RBL Agreement.  In the same month, the Prepetition RBL Agent reduced the Borrowing Base from $115,000,000 to $100,000,000, which required the Debtors to pay down the

resultant $15,000,000 deficiency in five equal monthly payments of $3,000,000 each, and rejected the Debtors' proposals from earlier in the year for alternative sources of drilling capital.

42.    The Debtors paid $6 million from October 2020 to December 2020 to reduce the debt balance ($2 million in October, $1 million in November, and $3 million in December 2020, for a total of $6 million).  As a result, as of December 31, 2020, the debt balance under the Prepetition RBL Agreement was $107.92 million.

43.    While such deficiency payments were being made, the Prepetition RBL Parties and the Debtors entered into Amendment No. 9 to Credit Agreement dated December 4, 2020 ("Amendment No. 9"), which required the Debtors to engage an investment banker to launch a sales and marketing process for the sale of substantially all of the Debtors' assets.  Amendment No. 9 also provided various milestones in connection with the potential sale.

44.    In January 2021, the Debtors provided the Prepetition RBL Parties with notice that they did not have sufficient liquidity to make further deficiency payments.

45.    The Prepetition RBL Parties' continuing negotiations regarding a forbearance related to the alleged defaults under the Prepetition RBL Agreement culminated in the Forbearance Agreement and Tenth Amendment to Credit Agreement (the "Forbearance Agreement"), dated January 29, 2021, pursuant to which the Debtors were obligated to engage in a sales and marketing process led by Intrepid Partners, LLC ("Intrepid") pursuant to certain revised milestones, and to concurrently commence preparations to file for chapter 11 bankruptcy protection.  During the initial forbearance period, the Debtors met the various milestones as required for the marketing of their assets as well as preparation for bankruptcy.

C.      *The Debtors' Prepetition Sale Activities*

46.     In connection with the Debtors' obligations under the Forbearance Agreement, the Debtors engaged Intrepid on January 15, 2021, to market and sell substantially all of the Debtors' assets.  Intrepid established a virtual data room that was populated with data from the Debtors, prepared the data room for marketing, and developed marketing materials.  Intrepid initially targeted and provided marketing materials to roughly 70 potential counterparties, and ultimately contacted approximately 95 counterparties, to gauge interest in acquiring the Assets.  Intrepid facilitated the execution of non-disclosure agreements with approximately 30 counterparties before providing each of them with access into the data room.  Intrepid also provided detailed technical presentations to approximately 20 counterparties as part of the marketing and diligence process.

47.     All prospective parties that Intrepid identified were encouraged and permitted to submit proposals to acquire the Debtors' assets.  The data room allowed the Debtors to facilitate information sharing on a confidential basis with prospective buyers.  The data room included detailed information regarding the Debtors' assets and business, as well as other information sufficient to allow prospective buyers to submit non-binding indications of interest ("IOIs").  The initial deadline to submit non-binding IOIs was March 16, 2021.  The initial deadline to submit binding bids was March 30, 2021; however, the parties agreed to extend that deadline to April 13, 2021, providing prospective buyers approximately five (5) weeks to perform their initial diligence.  Ultimately, ten (10) prospective buyers submitted IOIs, and three (3) prospective buyers submitted binding bids.  All price indications were well below the balance of the Prepetition RBL Facility.

48.     In May 2021, Alta Fundamental Advisers ( "Alta") acquired 100% of the loans and commitments under the Prepetition RBL Facility.  When Alta purchased the Debtors' first lien debt, the immediate pressure to consummate a sale transaction from the preceding Prepetition RBL Lenders subsided.  Given that breathing space, the Debtors, in consultation with Alta, decided to pause the sale process to make a considered determination as to whether viable alternative restructuring paths existed that might yield more value for the Debtors and their creditors.  Intrepid's engagement concluded shortly thereafter.

49.     In the months that followed, the Debtors and Alta explored a variety of alternative restructuring paths, including an equity recapitalization, restructuring the Debtors' second lien debt, and negotiating more favorable terms under its gas gathering agreement with UGI Texas Creek, LLC.  As part of this exploratory process, the Debtors were advised by Speyside Partners, LLC ("Speyside") on various issues, including the ability of the Debtors to raise capital with the Debtors' then-current capital structure.  Speyside also assisted with negotiations with UGI Energy Services, as described below.  Additionally, since being retained in January 2021, Huron has provided financial advisory services, which included exploring financing options to address the Debtors' liquidity constraints.  Unfortunately, none of these alternative restructuring paths proved viable within the time available to the Debtors.

50.     As necessary since entering into with the Forbearance Agreement, the Debtors have engaged with the Prepetition RBL Parties and their counsel to enter into subsequent extensions of the Forbearance Agreement.  During the various forbearance periods, the Debtors and the Prepetition RBL Parties engaged in extensive, good faith negotiations.  During this time, the Board conducted regular Board meetings and frequent meetings and calls with the Debtors' management team and its outside advisors.  The Board encouraged open and transparent dialogue

with the Debtors' secured creditors and considered multiple proposals and potential restructuring

opportunities.

**D.**     ***The UGI Agreement and the Failed Efforts to Renegotiate Same***

51.     In connection with the acquisition of the Texas Creek Assets in 2017

(described in paragraph 15 above), the Debtors required purchase-price financing.  As the parties

were readying to close on the purchase/sale transaction, the Debtors lost access to a portion of the

necessary financing.   To solve for the financing shortfall, gathering/piping assets that were

otherwise intended to be sold to the Debtors (enabling them to transport gas from the wellhead to

market) were instead sold to UGI.  As part of its acquisition of these assets, UGI committed to

provide the Debtors' continued utilization of the gathering system, but on onerous terms.

52.     <u>Minimum Volume Commitments</u>.  The UGI agreement includes what is

known in the industry as "minimum volume commitments" (or "<u>MVCs</u>")—an obligation that

compels the Debtors to pay UGI for use of the gathering and transportation system, even if the

wells do not deliver sufficient gas volumes.  In my view, when prices are high, producers are

sufficiently incentivized to drill, thereby increasing production volume and meeting the MVC.

When prices are low, however, MVCs compel the operator to increase production volumes by

spending money to drill potentially uneconomic wells, or otherwise force the operator to bear

additional (and fairly sizeable) fees for dropping below minimum volumes.   Currently, the

Debtors' daily production volumes are below the MVC, requiring additional drill capital (which

the Debtors do not have) to fill contract capacity.  In addition, the UGI agreement (unlike some

others in the industry) disallows volume "banking," meaning that a surplus in one month cannot

be used against a volume deficiency in the future.

53.    The Debtors estimate that, based on well-decline curves and no new drilling (given the absence of drilling capital), they may have to pay UGI more than $114.5 million in deficiency or shortfall fees over the remaining life of the agreement.

54.    <u>Capital Recovery</u>.  When new drilling requires extensions to the gathering system, the Debtors are contractually obligated to repay UGI for the costs of buildout.  UGI's capital outlays are to be repaid over ten years at an annual 9% interest rate, compounding monthly. What this means is that UGI can borrow funds in the market at, for example, prime (3.25%) and then capture a large spread from the Debtors over a 10-year period.

55.    Moreover, I understand that UGI may have charged the Debtors for expansion projects in excess of what similar benchmark projects cost.  Considering the 10-year repayment term and rapidly increasing cost of each additional compressor station (at 9% compounding interest), UGI is likely charging the Debtors significantly more than what each expansion project should cost.

56.    <u>Compression and Gathering Fees</u>.  As gas is "fed" into the system, UGI charges the Debtors fees for "compression" and for "gathering" (*i.e.*, running the gas up the pipe and out the other side).

57.    Compression fees are based on certain stages (*i.e.*, amount of suction needed to move the gas through the piping); lower suction pressure results in higher cost.  UGI's costs for achieving required pressure (*e.g.*, buying and installing compressors) are not "pass-through" expenditures charged to the Debtors; the "compression fees" are, rather, the only compression-related charges UGI may, under the contract, assess against the Debtors.  Yet, UGI has been wrongfully charging the Debtors for compressors, under the onerous "Capital Recovery" contract provisions.  In April 2019, for example, UGI added two CAT 3516s compressors, charging the

Debtors $913,000 in Capital Recovery.  In January 2020, UGI constructed a new station with one

CAT 3516 compressor, charging the Debtors $2 million in Capital Recovery.  In July 2020, UGI

added another two CAT 3516s compressors, charging the Debtors nearly $3.6 million in Capital

Recovery.  All the while, the Debtors were double-charged the applicable compression fees.

58.    As a separate matter, gathering and compression fees are subject to annual

escalation of 2.5%.  This becomes significant when compounded over the remaining life of this

agreement.

59.    <u>Dedication</u>.  The UGI agreement includes a purported covenant committing

all Debtors—and all affiliated persons—to port all gas yield in the three counties where the Debtors

operate through the gathering system, at the pricing/costs stipulated in the agreement.  This could

be an onerous restriction on the commercial utilization of land and inhibit bidder interest.

60.    Two observations should be made in connection with the dedication

provisions.  First, I understand that UGI only has existing gathering infrastructure in a small

portion of the three-county dedication area.  Typically, when a midstream company incorporates

multiple county dedication language in its gathering agreements, it already has in place the means

to deliver on dedication for the covered geographical area.  I am told that UGI does not have this.

So, if the Debtors wished to expand operations within the three-county area, they must essentially

pay UGI to build or acquire new infrastructure (pursuant to the 10-year, 9% compounding interest

"Capital Recovery" provisions) and, thereafter, pay the same MVC, gathering and compression

fees.

61.    Second, the Debtors' operations scale poorly when assessed against the

breach of this dedication covenant.  The Debtors do not manage a very large drilling profile; they

have relatively small operations for an unconventional oil and gas play, with a modicum of growth

potential under existing leases, and meaningful overhead costs.  Any restructuring strategy for the

Debtors (plan of reorganization or sale) requires the new equity sponsor to "scale-up" the business

to achieve success.  A prime section 363 bidder would be, for example, a company with other E&P

operations in the geographical area or with sufficient financial resources to make a meaningful

investment in the reorganized company's future.  The dedication language is, on its face, so

sweeping as to disincentivize ownership by those who could be most impactful in developing this

business.  In this way, the provision dramatically restricts the universe of potential restructuring

sponsors.

62.    <u>Failed Attempts To Renegotiate the UGI Agreement</u>.  Throughout 2021,

various parties—management, White Oak, Alta—successively approached UGI hoping to

renegotiate the terms of the UGI agreement.  These efforts have not, to date, been successful.  This

has significantly impaired the Debtors' ability to pursue otherwise available restructuring

strategies.

**E.    *The Eleventh Forbearance Agreement***

63.    In the absence of progress on alternative restructuring paths, on September

11, 2021, the Debtors and the Prepetition RBL Parties entered into the Eleventh Amendment to

Forbearance Agreement and Nineteenth Amendment to Credit Agreement (the "<u>Eleventh</u>

<u>Forbearance Amendment</u>").  In connection with the Eleventh Forbearance Amendment, the

Debtors informed the Prepetition RBL Parties that they were contemplating filing chapter 11

petitions in the Court and requested that the Prepetition RBL Parties negotiate certain matters

relating to a filing with the Debtors.  Among other things, the Debtors and the Prepetition RBL

Parties agreed to discuss and negotiate the terms of a process under section 363 of the Bankruptcy

Code to sell substantially all of the Debtors' assets, provided that the Debtors may

contemporaneously with that sale process also pursue a plan sponsor that could fund a plan of reorganization. The Debtors used commercially reasonable efforts to engage an investment banker in connection with the chapter 11 cases. This post-petition sale process contemplated by the Eleventh Forbearance Amendment is intended to build upon the sale process that was conducted by the Debtors and Intrepid in early 2021.

### IV. DEBTORS' CHAPTER 11 STRATEGY AND SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS AND OTHER MOTIONS

#### A.    *Purpose of the Chapter 11 Cases*

64.    The Debtors and their advisors are ready to commence a robust marketing process for plan sponsors or purchasers to maximize value for creditors and to facilitate the Debtors' emergence from the chapter 11 cases. During these chapter 11 cases, the Debtors intend to pursue dual tracks to maximize the value of the estates, which will result in (i) an asset sale restructuring, which allows the Debtors to enter into a sale transaction for the sale or disposition of the Debtors' assets, or (ii) a standalone plan of reorganization. Pursuing dual tracks provides the Debtors with the latitude necessary to negotiate the precise terms of their ultimate emergence from chapter 11.

65.    Consistent with this goal, the Debtors' new investment banker, Houlihan Lokey, began a marketing process on the Petition Date. The Debtors developed an extensive list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a sale or serve as a plan sponsor. Within several weeks of the Petition Date, the Debtors will distribute a teaser to the prospective purchasers, sponsors, and lenders, and expect to start executing confidentiality agreements shortly thereafter. Houlihan Lokey and the Debtors will work with all interested parties and any additional

parties to provide all diligence and will continue to actively seek potential interested purchasers, sponsors, and lenders.

66.    As described above, at the same time that the Debtors are marketing the assets for sale, the Debtors and Houlihan Lokey also will be soliciting parties' interest in acting as a plan sponsor for a stand-alone reorganization.  This dual track approach offers the Debtors maximum flexibility in determining whether a sale or a stand-alone plan of reorganization offers the estates the best value-maximizing proposition.  Depending upon the outcome of the marketing process for potential purchasers, investors, or lenders, the Debtors retain flexibility to pivot and pursue the transaction that offers the highest and best value for the estates.

67.    Because the sale and plan processes will proceed in tandem, the failure to identify a plan sponsor to effectuate a plan process will not delay an auction of substantially all of the Debtors' assets consistent with the timeline agreed upon with the Prepetition RBL Parties.  Even if the sale process is successful, it is likely that a plan will be necessary to ensure an orderly wind-down of the Debtors' estates and the distribution of any excess proceeds of the sale.

68.    In my opinion, the ability to "toggle" between the sale process and traditional reorganization will maximize the Debtors' enterprise value and will therefore maximize recovery to creditors.

## B.    *First Day Motions*

69.    Concurrently with the filing of these chapter 11 cases, the Debtors filed various First Day Motions seeking relief related to the joint administration of these Chapter 11 cases, the Debtors' operations, and the Debtors' cash managements needs to allow for efficient administration.  I am familiar with the contents of each First Day Motion, including any attached exhibits, and believe that the relief sought in each First Day Motion: (i) will enable the Debtors to

continue operations with minimal disruptions, (ii) is critical to the Debtors' restructuring efforts, and (iii) best serves the interests of the Debtors' estates and creditors.  It is my belief that the relief sought in each First Day Motion is narrowly tailored and necessary to achieve the goals identified above.  A list of the First Day Motions is set forth below.

a.  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief*;

b.  *Debtors' Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures As Well As Granting Related Relief*;

c.  *Debtors' Emergency Motion for Entry of an Order Extending the Time to File Schedules and Statements*;

d.  *Debtors' Emergency Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 1002-2(f)*;

e.  *Debtors' Emergency Motion for Entry of an Order (I) Approving the Form and Manner of the Notice of Commencement of the Debtors' Chapter 11 Cases and (II) Authorizing the Debtors to File a Consolidated Creditor Matrix*;

f.  *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis and to Use Cash Collateral*;

g.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts, and Business Forms, (II) Waiving Section 345(b) of the Bankruptcy Code, and (III) Granting Related Relief*;

h.  *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition and Postpetition (A) Obligations to Holders of Royalty Interests, Overriding Royalty Interests, and Working Interests, and (B) Production Expenses and Joint Interest Billings, and (II) Granting Related Relief*; and

i.  *Debtors' Emergency Motion for Entry Of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief.*

70.      The Debtors have narrowly tailored the First Day Motions to meet their goals of continuing operations with as little disruption as possible, maintaining the confidence and cooperation of its contract operators, customers, and vendors, and establishing procedures that allow for efficient administration of these cases.

71.      I have reviewed and discussed each of the First Day Motions and any exhibits thereto, and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records, and advisors.  I incorporate by reference the factual statements set forth in each First Day Motion as if set forth herein.

72.      It is my belief that the relief sought in each of the First Day Motions is necessary for the successful implementation of the Debtors' restructuring efforts and to maximize the recoveries available to creditors.  With respect to those First Day Motions that request the authority to pay specific prepetition claims or continue selected prepetition programs, it is my belief that the relief requested therein is essential to the Debtors' restructuring efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of these chapter 11 cases depend on the Debtors' ability to maintain its operations and to maximize the value of the estates.  The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

a.    *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief*

73.      The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will

provide significant administrative convenience without harming the substantive rights of any party

in interest.  Joint administration of these Chapter 11 Cases will have several benefits, including:

(i) permitting the Clerk of the Court to utilize a single general docket for these chapter 11 cases

and combine notices to creditors of the Debtors' respective estates; (ii) avoiding duplicative filings

and notices, thereby saving time and expense; (iii) significantly reducing the volume of pleadings

that otherwise would be filed with the Clerk of the Court; and (iv) circumventing a number of

unnecessary delays typically associated with the separate administration of related chapter 11

cases.

b.    *Debtors' Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures As Well As Granting Related Relief*

74.    The Debtors have also filed another purely administrative or procedural

First Day Motion to establish certain case management procedures that will apply to these chapter

11 cases including approving a service list.  By approving and implementing certain case

management procedures and approving a service list, the Debtors believe that the administration

of these Bankruptcy Cases will be streamlined and the burden upon the Bankruptcy Court will be

reduced.  As set forth in the respective motion, the Debtors have used the form of case management

order that is approved and encouraged within this district as the baseline for their proposed order.

c.    *Debtors' Emergency Motion for Entry of an Order Extending the Time to File Schedules and Statements*

75.    The Debtors have also filed another purely administrative or procedural

First Day Motion to extend the deadline by which the Debtors must file their schedules of assets

and liabilities, schedules of current income and expenditures, schedules of executory contracts and

unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements")

by 16 days, for a total of 30 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions.

76.    Given the size and complexity of the Debtors' businesses and financial affairs, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.

77.    To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents maintained by each of the two Debtors, relating to the claims of hundreds of creditors, as well as the Debtors' many assets and leases.  Given the scope of the Debtors' operations, it will take substantial time to gather and process such information.  In light of the size and complexity of the Debtors' businesses, and the resulting significant amount of work required to complete the Schedules and Statements, as well as the competing demands on the Debtors' management and professionals to assist in critical efforts to stabilize the Debtors' business operations during the initial postpetition period, an extension is necessary.

     d.    *Debtors' Emergency Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 1002-2(f)*

78.    The Debtors have also requested approval to retain Epiq Corporate Restructuring, LLC ("Epiq"),[6] as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania, effective *nunc pro tunc* to the Petition Date.  The Debtors anticipate that there will be in excess of 2,100 entities to be noticed in these cases.  In view of the number of anticipated

---

[6] The Epiq application is supported by a separate declaration of Sophie Frodsham of Epiq.

claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of

Epiq as the Claims and Noticing Agent is both necessary and in the best interests of the Debtors'

estates and their creditors because the Debtors will be relieved of the burdens associated with

noticing services. Accordingly, the Debtors will be able to devote their full attention and resources

to maximize value for their stakeholders and facilitate the orderly administration of these chapter

11 cases.

      e.    *Debtors' Emergency Motion for Entry of an Order (I) Approving the Form and Manner of the Notice of Commencement of the Debtors' Chapter 11 Cases and (II) Authorizing the Debtors to File a Consolidated Creditor Matrix*

      79.    The Debtors filed another procedural motion in which they seek approval

of the form and manner of the notice of commencement of this Chapter 11 Case (the "Case

Commencement Notice") and the use of a consolidated creditor matrix. The Debtors request

approval of their proposed form of the Case Commencement Notice, which includes notice of the

initial meeting of creditors under section 341(a) of the Bankruptcy Code (the "Section 341

Meeting"). The proposed form of the Case Commencement Notice is substantially in the form of

Official Bankruptcy Form 309F.

      80.    Although the Debtors have not yet filed their schedules of assets and

liabilities, they anticipate that there will be in excess of 2,100 entities to be noticed in this case. In

view of the number of anticipated parties-in-interest and the complexity of the Debtors' businesses,

the Debtors believe it is appropriate to modify Official Bankruptcy Form 309F, primarily for the

purpose of including the contact information of Epiq, the Debtors' proposed Claims and Noticing

Agent. The Claims and Noticing Agent's contact information should be included in the Case

Commencement Notice so that inquiries from interested parties concerning this case may be

directed to the call-center or email address established by the Claims and Noticing Agent for this

case. Use of the Claims and Noticing Agent's call-center or email address ensures that creditor inquiries may be timely and efficiently addressed in a cost-effective manner.

81. The Debtors believe that it would be more efficient and in the interest of justice (i) to file a single creditor matrix in satisfaction of section 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(a), Local Rule 1007-1 and Local Rule 1007-6, and (b) for the Debtors' proposed Claims and Noticing Agent to use a single creditor mailing matrix.

f.    *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis and to Use Cash Collateral*

82. The Debtors, in their business judgment, determined that entering these Chapter 11 Cases with postpetition financing in place would enable the Debtors to achieve the best outcome for their estates and their creditors. To that end, the Debtors seek entry of interim and final orders authorizing the Debtors to obtain postpetition financing in the form of a secured superpriority priming debtor-in-possession non-amortizing loan facility (the "DIP Facility") and to use cash collateral ("Cash Collateral"). After good faith, arm's-length negotiations between the Debtors and the Prepetition RBL Lenders, the Parties reached an agreement on the final terms of postpetition DIP Financing and memorialized their agreement in the final DIP Credit Agreement (the "DIP Credit Agreement"). The Prepetition RBL Agent will serve as agent under the DIP Credit Agreement (the "DIP Agent"). The Debtors believe that the DIP Facility proposed by the Prepetition RBL Lenders (each as a party from time to time to the DIP Credit Agreement, a "DIP Lender") provides the best financing proposal available to the Debtors. The DIP Motion is supported by a separate declaration by John C. DiDonato (the "DIP Financing Declaration").

g.      *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts, and Business Forms, and (II) Granting Related Relief*

83.     The Debtors seek the entry of interim and final orders: (i) authorizing the Debtors' continued use of (a) their current cash management system and existing bank accounts and (b) their existing business forms; and (ii) granting related relief.

84.     In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") comparable to the cash management systems used by similarly situated companies to manage the cash in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

85.     As of September 14, 2021, the Debtors maintained two deposit accounts. The first deposit account (the "Citizens Master Operating Account") is held at Citizens, the Debtors' former prepetition lender.  In April 2021, Alta acquired 100% of the loans and commitments under the Prepetition RBL Documents.  Thereafter, pursuant to the Successor Agent Agreement dated July 29, 2021 (the "Successor Agent Agreement"), Citizens resigned as administrative agent and collateral agent, and was succeeded by Delaware Trust Company ("DTC") in such capacities, but Citizens remained as Collateral SubAgent to DTC for purposes of maintaining perfection of the liens securing the Prepetition RBL Facility, including, but not limited to, the liens on the Debtors' bank accounts at Citizens.

86.     In August 2021, the Debtors opened a second deposit account (the "TCB
Master Operating Account") with Texas Capital Bank, N.A. ("TCB" and, together with Citizens,
the "Banks").  As of the Petition Date, the Debtors were in the process of transferring their banking
activity (including their Master Operating Account) from Citizens to TCB in accordance with the
Successor Agent Agreement.  Once the balance of the Citizens Master Operating Account is
transferred to TCB, the Debtors anticipate closing the Citizens Master Operating Account.

87.     The Master Operating Account—whether at Citizens or TCB—is used to
manage daily cash inflows and outflows associated with operations.  The Master Operating
Account makes payments including checks, wires, and automated-clearing-house ("ACH") for all
general and administrative expenses.  In addition, all debt borrowing and interest payments flow
through the Master Operating Account.

88.     In January 2021, pursuant to the Forbearance Agreement, an escrow
account was established at Citizens in Citizens' name, in its capacity as agent for Rockdale, for
the purpose of depositing the Debtors' excess cash ("Citizens Collateral Reserve Account").  Since
the establishment of the Citizens Collateral Reserve Account, the Debtors have made several
deposits to the Citizens Collateral Reserve Account in accordance with the Forbearance
Agreement.  In the Forbearance Agreement, the Debtors acknowledged that funds on deposit in
the Citizens Collateral Reserve Account constituted Collateral for the Prepetition RBL Facility.
Pursuant to the Forbearance Agreement, funds could be withdrawn from the Collateral Reserve
Account only with the prior written consent of the Required Lenders.

89.     On September 20, 2021, the balance of cash on deposit in the Citizens
Collateral Reserve Account was transferred to an account with the Prepetition RBL Agent at the
direction of the Prepetition RBL Lenders (the "DTC Collateral Reserve Account").  As with the

Citizens Collateral Reserve Account, the DTC Collateral Reserve Account was established at the Prepetition RBL Agent in the Prepetition RBL Agent's name.  Prior to the commencement of the Chapter 11 Cases, consistent with the parties' agreement under the Eleventh Amendment to Forbearance Agreement and Nineteenth Amendment To Credit Agreement ("Eleventh Amendment"), dated as of September 11, 2021, with the consent of the Debtors and at the direction of the Prepetition RBL Lenders and in accordance with the Prepetition Third Party Intercreditor Agreement, $3,621,526.23 of cash on deposit in the DTC Collateral Reserve Account (the "Applied Cash") was applied to the amounts due and owing under the Prepetition RBL Facility and the Citizens Hedge Early Termination Claim which is now held by the Prepetition RBL Lenders.  Accordingly, as of the time of filing the Debtors' chapter 11 petitions, the balance of the DTC Collateral Reserve Account is $964,059.93  (the "Undisbursed Balance").  The Debtors have agreed with the Prepetition RBL Lenders and Prepetition RBL Agent that the Undisbursed Balance shall remain on deposit in the DTC Collateral Reserve Account pending further order of this Court.

90.    Absent the ability to maintain their Cash Management System and use the existing Bank Accounts, the Debtors would have to significantly alter their business operations to comply with the UST Guidelines, including closing all prepetition Bank Accounts and opening new accounts.  In light of the timeline and objectives of these chapter 11 cases, as well as the administrative burden the commencement of these chapter 11 cases already has placed on the Debtors, compliance with the UST Guidelines would impose a substantial burden on the Debtors' estates.  Among other things, altering the Cash Management System and the existing Bank Accounts could delay the receipt of payables from customers or disrupt payments to essential vendors at a time when their support is most critical.  It is therefore critical that the Debtors be

permitted to continue to use their Cash Management System and existing Bank Accounts in accordance with the procedures they put in place prior to filing these chapter 11 cases.

91.     In the ordinary course of their business, the Debtors utilize a variety of preprinted correspondence and business forms, such as letterhead and checks (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records").  To avoid a significant disruption to their business operations and to minimize unnecessary additional expenses to their estates, the Debtors request that the Court authorize the continued use of their Business Forms and Books and Records to the limited extent they are preprinted and in existence before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the unnecessary expense and delay of ordering entirely new forms as required by the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Operating Guidelines").

h.      *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition and Postpetition (A) Obligations to Holders of Royalty Interests, Overriding Royalty Interests, and Working Interests; and (B) Production Expenses and Joint Interest Billings, and (II) Granting Related Relief*

92.     The Debtors seek the entry of interim and final orders authorizing the Debtors to pay or honor, in their sole discretion, prepetition and postpetition obligations (i) to the holders of royalty interests, overriding royalty interests, and working interests, (ii) incurred in connection with the development, maintenance, and operation of the oil and gas leases and wells in which the Debtors have an ownership interest, and (iii) for joint interest billings incurred under joint operating agreements.

93.     I am familiar with the relief sought in this motion, including any attached exhibits, and believe that the relief sought: (i) will enable the Debtors to continue operations with

minimal disruptions, (ii) is critical to the Debtors' restructuring efforts, and (iii) best serves the interests of the Debtors' estates and creditors.  It is my belief that the relief sought in this motion has been narrowly tailored to achieve the goals identified above.

94.     Timely payment of Royalties (defined below), overriding royalty interests ("ORRIs"), amounts due to Working Interest Owners (defined below), Production Expenses (defined below), and JIBs (defined below) (collectively, the "Production Obligations") is critical to the Debtors' ability to reorganize.  If the Debtors fail to satisfy the Production Obligations as they come due, their operations will be severely impacted and production may completely cease for certain wells.  This would severely harm the estate.  Maintaining the Debtors' oil and gas leases is of paramount importance for this case.  The revenues the Debtors derive from their producing oil and gas properties provide operating income and represent the bulk of the value around which the Debtors are reorganizing.  Satisfaction of the Production Obligations as they come due is in the best interest of the Debtors and their estates.

95.     The Debtors are obligated to remit to the lessors who own the mineral rights leased by the Debtors (the "Royalty Interest Owners") their share of production from the producing wells located on their respective lease (or lands pooled or unitized with those wells) free of expenses of production (the "Royalties").  Further, certain assignments of leases create an ORRI, which is an interest in a share of the production from the applicable wells, free of expenses of production, and which burdens the Debtors' working interests.  The Debtors are obligated to remit to the owners of the ORRI (the "ORRI Owners") the attributable share of the proceeds.

96.     In addition to the Royalties and ORRIs, certain third parties own working interests ("Working Interests" together with non-operating Working Interests, Royalties and ORRIs are collectively the "Third- Party Hydrocarbon Interests") in the leases and wells operated

by the Debtors under joint operating agreements[7] (the "Working Interest Owners" and, collectively

with the ORRI Owners and Royalty Interest Owners, the "Interest Owners").  As a result, when

the Debtors serve as operators, they are responsible for the timely and proper operation of the wells

for the benefit of the Debtors and other Interest Owners.  Working Interest Owners later reimburse

the Debtors for their respective share of costs.

97.    In discharging their obligation to act as a reasonable and prudent operator

under JOAs and other instruments, the Debtors market and sell produced hydrocarbons and then

remit to Interest Owners their share of the production revenue.  Such payments are generally paid

within 30 to 60 days following the month of production.  The Debtors calculate amounts owed in

accordance with the underlying lease or other instrument, which is typically based on the

production revenue received by the Debtors less applicable production and property taxes and, in

most instances, certain post-production charges, such as gathering and processing fees.  By the

Royalty Interest Motion, the Debtors seek to remit or honor undisputed, prepetition Interest Owner

disbursements in the Debtors' ordinary course of business, in each case, subject to all of the

Debtors' rights under the applicable agreements.

98.    Not paying the Interest Owners would jeopardize the Debtors' interests in

their oil and gas leases.  If they do not receive their share of production revenue, Interest Owners

may argue lease maintenance provisions cause an automatic termination of the lease, leading to

termination disputes.  Additionally, some Interest Owners have contractual remedies under a JOA

or other agreement, including the grant of a security interest, the right to remove the applicable

---

[7]  Joint operating agreements ("JOAs") are commonly used in the oil and gas industry to govern the operation, development, and maintenance of wells and oil and gas leases.  JOAs are comprised of an operating party and one or more non-operating parties.  The operator and non-operating parties combine their interests in oil and gas leases and/or wells for the purpose of sharing the costs and proceeds of development, operation and production in a specified area.

Debtor as operator, and the right to be paid interest on amounts owed.  Under section 541(a) of the Bankruptcy Code, the Interest Owner disbursements held by the Debtors prior to remittance may not be property of the Debtors' estates.  Accordingly, paying Interest Owners prevents the risk of loss and avoids unnecessary litigation with valued co-owners that would otherwise impede the Debtors' efforts to reorganize.

99.    As of the Petition Date, the Debtors estimate that they owe approximately $2,095,365 to Interest Owners in pay status (excluding any funds disbursed directly by purchasers of oil and gas production) and approximately $737,683 to Interest Owners to be held in suspense.[8] The Debtors request approval to pay up to $2,833,048[9] and to continue disbursing to Interest Owners in the ordinary course of business on a postpetition basis.

100.    Under the terms of the Shell Hedge, the Debtors are obligated to pay to Shell, on a monthly basis, the positive difference (if any), between the strip price for gas and the contract price under the Shell Hedge, multiplied by the notional volume of gas specified in the Shell Hedge.  As of the Petition Date, consistent with the terms of the Shell Hedge, the Debtors are obligated to pay to Shell an estimated September settlement amount equal to $648,210.  The Debtors request approval to pay up to $648,210 and to continue disbursing to Shell in the ordinary course of business on a postpetition basis.

101.    The Debtors incur numerous lease operating expenses and other costs relating to development and production, including obligations owed to vendors, contractors,

---

[8]   Where a payee cannot be identified or located, or there is a dispute among third parties as to who is entitled to such payment, payments are held in a suspense fund pending an identification of the owner or resolution of the ownership rights thereto.

[9]   Of this $2,833,048 that the Debtors seek approval to distribute, $2,095,365 is owed, and would be distributed directly to, specified Interest Owners (*i.e.*, those that are in so-called pay status).  The remaining $737,683 to be approved would be held in suspense. *See supra* note 4.  The funds in suspense are on account of accrued but unpaid liabilities of the Debtor.

subcontractors, haulers, drillers, land lessors, providers of services related to land use, well testing and measurement service providers, and other suppliers of oilfield services (collectively, the "Mineral Contractors").  Such parties provide services and supplies necessary to ensure that operations continue in a timely manner.  The Debtors also incur fees under surface use agreements, whereby they are obligated to compensate surface estate owners for the use of their property and related disturbance (amounts owing to Mineral Contractors, fees under such surface use agreements, and other expenses to preserve leases, collectively the "Production Expenses").

102.    For wells the Debtors operate, they are reimbursed for part of the Production Expenses incurred from non-operating Working Interest Owners through the payment of joint interest billings, or by netting the Working Interest Owners' share of production revenue against their share of the Production Expenses.  Regardless of when an operator is reimbursed by non-operating Working Interest Owners, the operator must continue to pay expenses in a timely fashion.  Under state law, certain Mineral Contractors may be entitled to statutory liens on the operator's interests in its assets.  *See* 49 P.S. §1508(a).  Failure to pay Mineral Contractors timely may result in liens on the operator's assets, and the JOAs typically require the operator to keep the oil and gas interests that are subject to the JOA free and clear of such liens and encumbrances.

103.    In order for the Debtors to produce cash flow and reorganize successfully, they must maintain and operate their producing wells in the ordinary course.  The Debtors also must be able to complete wells that are in various stages of construction and development without delay or interruption.[10]  The services and materials the Mineral Contractors provide are essential to these purposes, and cannot be easily replaced, if at all.  In the Debtors' industry, if Mineral

---

[10] The Debtors may decide, in their business judgment, not to complete any or all of the wells that are currently under construction and/or development.

Contractors are not timely paid, they will simply stop working, causing immediate harm to the estate.  The Mineral Contractors are familiar with the Debtors' operations and production plans.  They are either working or providing services unique to the Debtors' needs.  Some are true sole-source providers of unique goods and services, while others cannot be readily replaced.  Others provide services, such as disposal services and plugging and abandonment activities, necessary for regulatory compliance and protection of the environment.  The Debtors must have access to competent service from experienced crews.  An alternative service provider, in contrast, would undoubtedly have ramp-up time and delays relative to one already in place.  Further, the Debtors have developed strong relationships with their Mineral Contractors.  Such relationships—and the value they provide—cannot be easily replaced, but will be unduly strained, perhaps irreparably, if Mineral Contractors are not timely paid.  For these reasons, timely paying undisputed Production Expenses when due in the ordinary course is a valid exercise of the Debtors' business judgment and is necessary to avoid immediate harm to the Debtors and their businesses.

104.    As of the Petition Date, the Debtors estimate that they have approximately $6,242,948[11] of accrued but unpaid Production Expenses outstanding.  The Debtors request approval to pay up to $1,500,000 of the prepetition Production Expenses on an interim basis, up to $4,742,948 on a final basis, and to continue paying Production Expenses in the ordinary course of business on a postpetition basis.

105.    The Debtors also own working interests in leases and wells operated by third- parties under various JOAs.  The Debtors receive their share of revenue (or takes in-kind the production) from the operators of these wells, and then reimburses the applicable operators for their share of the production costs through the payment of joint-interest billings ("JIBs").  In an

---

[11] This figure includes lease operating expense, capital expenditure, and land lease whom the company expects to pay to minimize the disruption to business operations; it excludes JIBs.

average month, the Debtors pay or are otherwise responsible for approximately $10,000 in JIBs. The Debtors request authority here to pay these invoices in the ordinary course of business.

106.    The failure to timely pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtors' interest in a well and the underlying oil and gas lease and could lead to defaults.  Therefore, the Debtors request authority to continue to satisfy these JIBs as they arise in the ordinary course of business, to avoid the disruption and complex disputes that non-payment of the JIBs would cause.

107.    As of the Petition Date, the Debtors estimate that they have approximately $1,212 of accrued but unpaid JIBs.  The Debtors request approval to pay up to $1,212 of the prepetition JIBs upon entry of a final order, and to continue paying JIBs in the ordinary course of business on a postpetition basis.

      f.     *Debtors' Emergency Motion for Entry Of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief*

108.    The Debtors also seek entry of interim and final orders: (i) approving the Debtors' proposed adequate assurance of payment for future utility services and determining that their proposed adequate assurance provides Utility Providers with adequate assurance of payment under section 366 of the Bankruptcy Code, (ii) prohibiting Utility Providers from altering, refusing, or discontinuing services to, or discriminating against, the Debtors, (iii) approving the Debtors' proposed procedures for resolving additional adequate assurance requests, and (iv) granting related relief, each subject to any order governing the use of cash collateral.

109.    In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), and other similar services (collectively, the "Utility

Services") from a number of utility companies (each, a "Utility Provider" and, collectively, the "Utility Providers").

110.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these chapter 11 cases.  The Debtors' business involves developing, producing, and marketing oil and natural gas and the Debtors must maintain the ability to run their production equipment in a near-constant state.  Moreover, the Debtors' operations require electricity and gas for lighting, heating, and air conditioning.  In addition to the production processes conducted in the field, the Debtors operate corporate offices, as well as several regional field offices responsible for ensuring the smooth operation of the Debtors' business.  These offices require electricity, telecommunications, water, and waste management services to operate in each of their respective locations.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption could jeopardize the Debtors' ability to manage their restructuring efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

111.     To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.  On average, the Debtors pay approximately $6,270.00 each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ended August 31, 2021.  Accordingly, the Debtors estimate that their cost for Utility Services during the initial 30 days following the Petition Date, will be approximately $6,300.00.  To the best of the Debtors' knowledge, the Debtors do not have any existing prepayments or deposits with respect to any Utility Providers, but certain Debtors may have provided prepetition deposits to certain Utility Providers in the ordinary course.  To the

Debtors' knowledge, other than services rendered and not yet billed, the Debtors are current on all outstanding utilities payments, and in fact, the vast majority of such utility payments are auto-debited from the Debtor's bank account.

112.    The Debtors intend to timely pay postpetition obligations owed to the Utility Providers in the ordinary course of business. The Debtors believe that cash on hand and cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with their prepetition practice during the pendency of their chapter 11 cases.

113.    To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $3,135.00 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses for the twelve-month period ended August 31, 2021, net of any prepetition deposits provided to the Utility Providers in the ordinary course. The Adequate Assurance Deposit will be held in the segregated account for the benefit of the Utility Providers (the "Adequate Assurance Account") for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Providers. The Adequate Assurance Deposit will be held by the Debtors. The Debtors will deposit the Adequate Assurance Deposit in the Adequate Assurance Account within five business days after entry of the final order granting the motion. The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' cash flow from operations and cash on hand, demonstrates their ability to pay for future Utility Services in accordance with their prepetition practices and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  September 24, 2021           */s/ John C. DiDonato*
       Pittsburgh, PA           John C. DiDonato
                        Chief Restructuring Officer
                        Rockdale Marcellus Holdings, LLC and
                        Rockdale Marcellus, LLC


*[Signature Page to Declaration of John C. Didonato, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions]*